This is case number 4160347 and 4160372, Service Employees International Union versus the Illinois Labor Relations Board. For the appellant, Tyson Marone appearing. And for the appellee, Mark Bennett and Sharon Purcell. It appears you've set up your time. All right. Please proceed. Good morning, your honors. May it please the court. My name is Tyson Marone and I'm the general counsel for SEIU Local 73. This court serves an important purpose in these proceedings and has in several proceedings in the past as an important check on overreaching from the Illinois Labor Relations Board. The overriding principle that ties into each of the arguments I'm going to talk about today is this court's repeated policy statement that bargaining rights are to be extended broadly and therefore exceptions to those bargaining rights should be narrowly construed. For example, when the court is called upon to determine whether someone's a confidential employee, whether they have access to labor relations issues, it applies that principle. It applies the presumption that someone should have bargaining rights unless those bargaining rights are very clearly excluded from a clear policy exception. Most recently the court did this in 2015 ILAP 1st 150794. And this comes back to a Supreme Court case, the City of Decatur 122 IL 2D 353. So repeated throughout this argument is that when given two choices, one to extend bargaining rights and one to limit them, this court should adopt the principles that extend those bargaining rights. Now I want to talk just for a moment about the standard of review. Much of what the union is asking this court to do is to look at the statute and interpret it in a vacuum without regard to any facts relevant to this case. We are asking what does this Nacolni exception language mean? We are asking how do these three components of the statute fit together? Those are pure questions of law. And therefore no deference to the labor board's decision is appropriate and this court should review those issues to know. So there are three broad topics that I'm going to talk about today. One is this Nacolni exception language. Two is how these three parts of this provision of the statute fit together. And three is the serious constitutional issues raised by this case if that statute is read the way that the board and the Secretary of State suggests. So I'd like to start with the Nacolni exception language. The union has repeatedly said that this Nacolni exception language contained in the statute should be read in accordance with the case law from which the statute was taken. And that is a well-held principle in judicial jurisprudence. On the other hand, the Secretary of State and the board have been totally unclear on what definition should apply to that portion of this provision. When we go to the Nacolni court and what the Nacolni court said that this language means and what the 340 plus decisions that have interpreted that Nacolni language have said that it means, it really comes down to planning. And the central question is does this individual who's being analyzed have the authority to determine what is to be done within the department. And the dividing line is that those who fit the Nacolni exception get to determine what is to be done within the office. Those who don't are responsible for implementing the plans determined by higher ups. And under that analysis, there can be no question that these driver's facility managers do not meet the Nacolni exception. They do not plan what is to be done within the Secretary of State office. So a couple of the cases that talk about that distinction are found in the union's initial brief at pages 11 through 12. Isaacs through Naylor is the first of them. And then Bell versus Muncie, I believe. Ball versus Muncie is the second of them. In its struggle to come up with an alternative definition for what this language should mean, the board's brief really emphasizes why it has no alternative definition. So if you look at page 44 and 45 of the board's brief, the board says that someone fits this Nacolni exception if they have more than ministerial responsibilities. So they're saying the bar is so low that so long as your duties don't require even a little bit of discretion, you fit the Nacolni exception. Surely that can't be right. They say alternatively that if someone has an in-charge presence, then they fit the Nacolni exception. Well, the General Assembly could have said that the highest individual at a facility can't be in a union. They didn't say that. Instead, they have this language that's in section 3N. So that can't be right. They later say on page 45 that somebody will fit this Nacolni exception if they have the authority to determine the manner in which those policies are implemented. But that goes directly against Nacolni and what I talked about earlier in those other cases. Implementation of plans developed by somebody else does not fit the Nacolni exception. What fits the Nacolni exception is making those plans. And there's no evidence in this record that DFMs make those plans. And then lastly, they say that somebody may fit the Nacolni exception if their duties involve fulfilling the department's mission of providing consistent and satisfactory customer service. Well, who in the world in the Secretary of State's employ doesn't exist to serve the department's mission of providing consistent and satisfactory customer service? That's everybody, presumably, employed by the Secretary of State. So in going through what they say this Nacolni exception means, they give no acceptable alternative definition for what it could mean. So the reason I spend a lot of time on that is because this Court has a choice. And the Court has a choice between applying a very clear, very well-developed set of rules and principles that have been developed in over 340 cases taken from Nacolni, or else letting the Board make it up as it goes along on a case-by-case basis. And given that choice, we cite an article by Justice Scalia in our brief that says that given that choice, take the clear path. Take the one that gives parties like me, parties like the Secretary of State, an actual idea of who will meet this test and who won't meet it going forward. So that, we believe, is one of the most important reasons that you should interpret this language in accordance with the case law from where it was adopted. And as I said, the case law makes very clear that you have the right to do that. In fact, there's a presumption that when the General Assembly adopts language, it knows what it's adopting, and it is adopting the meaning that the Court prescribed to that language it adopts. And going back to the point that I said at the beginning, another reason to interpret this the way that the Union suggests, we live in a state where the public policy is that bargaining rights should be extended broadly. And given a choice between Nacolni means whatever the labor board and management wants it to mean, or that it means a very narrow exception written into the law, the one that extends bargaining rights broadly is that narrow exception. So, in response to all of these arguments, all the board says, all the Secretary of State has said, is there's a redundancy. Because in the provision right after this provision, it says Rootan-exempt employees are also excluded. And they say, surely, it didn't mean to put Rootan-exempt up here, and then Rootan-exempt again right down here. Well, as we set forth in our brief, we don't believe there's a redundancy because those are two alternative tests with separate components that have to be met. And we also don't believe there's a redundancy because in putting that Nacolni language in the first provision, there's an analysis. An analysis based on 340 cases of learned decisions about what titles fit this classification and what don't. So we don't think there is a redundancy between those two provisions. But even if there is, the presumption against redundancy is just a presumption. And it can be rebutted. And for all of these other reasons that we've identified, it should be rebutted because our definition provides the parties with a workable framework for moving forward. Because our interpretation extends bargaining rights broadly. And because, frankly, it just makes more sense. It makes sense that the General Assembly did not pull this very peculiar phrase out of thin air. It pulled it from Nacolni. And therefore, it should be interpreted in accordance with Nacolni. So then when we get to the application of Nacolni, this is a really simple case. Neither the Board nor the Secretary of State has identified a single comparable case where any court has determined that people who have the limited type of discretion that DFNs have fit within the Nacolni exception. They haven't found one because there isn't one. In fact, the most on-point case that's been identified in these proceedings is Gibbons v. Bond. In Missouri, there are branch managers. And branch managers do a lot of the same stuff that DFNs do in Illinois. And the court was called upon in Gibbons v. Bond to analyze whether those folks met the Nacolni exception. And it found they don't. And it found that they don't even where those branch managers have more duties than what the DFNs have here in Illinois. They conduct interviews. They do public relations functions. And they have an opportunity to create their own budgets. DFNs don't do any of that. But the court in Gibbons said that's still not enough to meet the Nacolni exception. So the union in a couple of different places has tried to identify those hallmarks of when somebody's likely to fit within the Nacolni exception. We first did so at pages 12 and 13 of our initial brief. And if you run through those different factors the courts have relied upon, it's clear that DFNs don't fit within any of them. The first question asks whether they're at or near the top of the office holder's position. Here there's at least five layers of organization between them and the Secretary of State. They are not at or near the top. The second factor is whether they have a role in determining how the budget for the public office should be spent. There is not one reference in this record to any budgetary responsibilities, significant budgetary responsibilities, for developing the budget for their office that DFNs have. The next factor is whether there are specific examples of policies that they have been instrumental in implementing. Later in our brief we give a block quote of the full evidence presented at hearing with regard to these DFNs' input into policy. And I'll tell you, it wasn't impressive. It was said that there are sometimes meetings that the Chief of Staff holds with them. In those meetings the Chief of Staff wants to tell them things. And while he's there he also takes their input. But that is not creating policies. In fact, in one of our earlier briefs we said if giving the opportunity to give input is enough to make someone Nacolni-exempt, then I'll make everybody here Nacolni-exempt by putting up a box for you to put your complaints in or your suggestions in. The next factor is whether these DFNs have frequent interactions with public officials or their top advisors. And here again, I go back to that block quote. There was no evidence presented about the frequency or the import of these meetings that they have with higher-ups, just that they exist. The next factor is whether there's independent expenditure authority. Here there is no evidence that DFNs have significant independent expenditure authority. The last factor is whether there's any significant supervisory authority over major terms and conditions of employment. Firing, setting wages, hiring. There's no evidence in the record that DFNs do any of that. So when we go through those factors, it is very clear that DFNs do not fit within the Nacolni-exception. So after that, I'd like to move to the second point of the union's argument, which is how these three components of the statute fit together, or at least of this provision fit together. And the union said since the outset that the way that this provision should be read is by applying to individuals who hold the classification of executive one or higher and either fit within the Nacolni-exception or else are exempt under the Merit Employment Code. And let me tell you why I believe that we have the right interpretation. Because before hearing when we were arguing about whether DFNs were even impacted by these amendments, the union set forth its position, which I just explained to you, and the Secretary of State agreed with us. He said, yes, this is how the statute reads. So the party who was trying to exclude these folks and who had every interest in the world to read this provision as narrowly as possible to union rights read it and said, yeah, the union's got it right. The union interpreted this provision correctly. Another reason why I think this provision should be read the way that the union suggests is because if you look at every other instance in these amendments where the General Assembly intended a this or that or that option, a choice as to between three or more items, it separately enumerated them by either Roman numerals in some places, letters in others, numbers in others, but they were always enumerated. And so we know that when the General Assembly intended a this or that or that option, it enumerated the different options. It did not do so in this provision. Had it done so, then the board would be correct. The Secretary of State would be correct, but it didn't do so. And then the last reason that we believe this should be interpreted the way that the union suggests goes back to that first point that I made. Which option grants bargaining rights more broadly? Which is the policy of the State of Illinois. And the option that grants bargaining rights more broadly is the one that limits this exclusion to executives who also meet other criteria. Now, finally, and before I conclude, I just want to say a few things about the constitutional question. Should this court disagree with the union's interpretation of how these provisions fit together and say that executives one or higher are automatically excluded, then we have an unconstitutional statute. And that statute is unconstitutional because the evidence in the record is clear. The Secretary of State's witness himself said, executives one in Chicago who work in a driver's facility do the same thing as DFMs downstate. And they made a big point of that at the hearing to talk about all the similarities between these two titles. But if they do the same thing, if the positions are interchangeable, as the Secretary of State suggested, then we're at a point where only executives are automatically ousted of their union. But DFMs who are identical, who do the same thing, get to keep their union. Now there are protections in the Illinois Constitution of equal protections and against special legislation. There has to be a reasonable basis for distinctions. They cannot be arbitrary. And if this provision is read to say that only executives lose their union, that is an arbitrary classification between these two titles and should be held unconstitutional. And I should say in closing that that's yet another reason that the provisions, when we go back to the second point, should be read as a multi-part test as opposed to one that automatically excludes individuals if they fit into any one of the three components. That's all I have for now and I'd like to reserve the remainder of my time. Excellent. You will have rebuttal. Thank you. Please proceed. Good morning, Your Honors. I am Sharon Purcell, Assistant Attorney General on behalf of the Illinois Labor Relations Board. The question before this court is did the Board clearly err when it determined that employees in the job positions of DFM 1 and DFM 2 and Executive 1 and Executive 2 at issue in this case are not public employees under Section 3N as amended and therefore are excluded from collective bargaining. This is the first review of a Board's decision interpreting this exclusion that was enacted as part of Public Act 97-1172 in April 2013. The Board's decision here is consistent with the language of the provision at issue, with the statute as a whole and with the intent of the legislature when it enacted this public act and the Board's decision should be affirmed. Board's interpretation of this provision is the correct interpretation. It's construed as a three-part test where if employees of the Secretary of State's office meet one of the three parts of the test, only two of which are at issue here, they are excluded from collective bargaining. The Board followed fundamental canons of statutory construction when it came to its determination, the most fundamental of which is to give effect to the intent of the legislature when it enacted this provision within 97-1172 and it's important to understand yes, counsel for the union is correct, the act, the public policy behind the act has always been to grant broad collective bargaining rights. However, in 2013 when this was passed and for a couple of years leading up to that unionization of the state workforce had reached 96% higher than any other state union. The General Assembly was aware of problems that were being brought to it by the state agencies and by constitutional officers who were faced with not having managerial type personnel in their facilities across the state who were not also bargaining unit members. This led to inefficiencies, ineffectiveness in government and blurred the line. There needs to be a line between, there's always been and the act recognizes it, a line between management and labor. Accordingly, it passed Public Act 97-1172 which did several things including allowing the governor to make designations of certain employees under his jurisdiction who are managerial and rightly should be excluded from collective bargaining units. At the same time, it amended Section 3N and provided exclusions within each of the other constitutional officers and employees, employment positions. It is the Comptroller, the Office of the Attorney General, the State Treasurer and here the Secretary of State. Each one of these provisions of these criteria excluding employees under the Secretary of State's jurisdiction here is also included within exclusions provided for the Comptroller and the Treasurer and the Office of the Attorney General. However, they are provided separately. This is the only office that has all three. Obviously, consistent with the other exclusions criteria excluding employees under the other constitutional officers. The statute needs to be read as these are three standalone tests. Otherwise, it creates an inconsistency between who is excluded and what the criteria is for Secretary of State's employees who must be according to the Union's interpretation Executive I or II or higher and meet one of the other two criteria whereas, for instance, with the Attorney General, you can be an attorney, somebody with a law license or meet the same criteria that set forth the second criteria here that employees whose positions authorized either directly or indirectly meaningful input into government decision making on issues where there is room for principled disagreement on goals or their implementation. It should not be, the General Assembly could not have intended such this inconsistency in the statute when it was enacting all of these at the same time. With regard to the second criteria here it's important to realize that all of the cases that the Union is relying on is language that the federal courts have given to determine whether or not party affiliation is an appropriate criteria to be considered in hiring, firing other personnel decisions. Here the context is that the General Assembly wanted to capture employees who were managerial type employees and needed to be instead of included with their subordinates. Accordingly, the Board interpreted this language in the context of the Act which is determining whether or not these DFM employees here are appropriately included in the bargaining unit and it used this language that the Board, that the General Assembly used as a mechanism to identify who these employees are. The Board is not charged with determining whether or not party affiliation is an appropriate consideration for whether or not an employee can hold a DFM position. It's charged with determining whether or not an employee can be in a collective bargaining unit and that's what it did here. Additionally, the General Assembly, if it wanted to, Nekomi is here in Illinois, Rutan, same thing. Under Rutan if an employee is a Rutan exempt employee their party affiliation can be considered in whether or not they should hold the position. The General Assembly used Rutan exempt in the immediately following provision applying to the Secretary of State what employees are in or out. It used it in other provisions, other sections of the Act. Clearly, if the General Assembly had wanted to use that language and say, you can say Nekomi but really it's Rutan exempt, they knew how to do that. When they used different language it should be given a different interpretation and that's what the Board did here and it did it in the context of what was the General Assembly trying to do here when it enacted this legislation after it realized that 96% inclining of a non-53,000 state employee workforce was unionized and accepted reports that had come to it that it was affecting the operation of the state government. It's very straightforward. It manifests fidelity to the language. It affects the legislative intent behind 97-11-72 which was again to provide efficient state government and its decision making should be affirmed. Thank you. Thank you for your argument, Mr. Bennett. May it please the Court, I'm Mark Bennett on behalf of the Secretary of State. The issues I will be addressing today are whether the DFMs are employees whose position authorizes either directly or indirectly meaningful input into government decision making on issues where there is room for principled disagreement on goals of their implementation. Whether the amendments of the Act as interpreted by the Board are constitutional and whether the DFMs hold a position classification of Executive I or higher. We respectively submit that the answers to each of those questions is yes. It is not an exaggeration to say that other than paying taxes, perhaps one of the most regular interactions the public has with its government services is through obtaining vehicle registrations, driver's licenses, and other related services from the Secretary of State's office. Indeed, the experience of going to the Department of Motor Vehicles is a common societal reference. Fortunately, in the state of Illinois due to the DFMs and the other great work of the Secretary of State's office, the experience is much more pleasant than the experiences often depicted by comedians, television shows, and movies. I make this point to underscore the significance of the responsibility of the DFMs at issue in this case. The DFMs serve as the public face of the Secretary of State's office. The DFMs serve as the highest ranking employee in the downstate driver services facilities. They are responsible for providing driver services to Illinois residents on the Secretary's behalf. They undeniably are responsible for overseeing the individual driver's facilities and ensuring that their operations comply with all of the Department's policies and procedures. It is evident that the DFM's job function is to ensure the overall effective and efficient operation of the individual facilities. To this end, the DFMs have the responsibility for the individual facility's day-to-day operational activities. As stated by the Director of the Secretary of State's downstate services, in his testimony in this case, Mike Mayer, said that the DFMs are, quote, the captains of the ship. And that is very similar to the language used by the sponsor of the amendments at issue in this case, Barbara Flynn Curry, when she stated during a legislative debate that the amendments to the Act were necessary because the existing situation, quote, turns the idea of running the ship of state totally on its head. Since you're citing the General Assembly or the member of the General Assembly what was said, are you suggesting that the statute is ambiguous? I think that whether or not it is ambiguous, we don't believe that it is ambiguous, but I think we should be considering what a certain legislator said it should be. Well, I mean, again, whether I think it, I don't believe it's ambiguous, but in the event that you do, I think that the legislative intent is necessary or it's appropriate to look at. Now, the DFMs at issue in this case do authorize, either directly or indirectly, meaningful input into the government decision-making on issues where there is room for principled agreement. Give me an example. I'll give you an example of how they do this. All right. There are several examples in the record in this case. The first example that I would cite is that the board made the factual determination, which should be only overturned if it's against the manifest weight of the evidence, that the with respect to customer service, the DFMs exercise discretion on whether or not an individual has provided sufficient documentation. Now, it's true that the department does have certain guidelines on what documentation may be required in certain circumstances, but it's the DFM who's on the ground that in looking at the documentation determines whether or not that documentation is actually sufficient, whether it meets the guidelines, whether it's a forgery or whether it's otherwise inappropriate or appropriate to determine whether or not an ID or driver's license or other official state document can be issued. Another example would be the one cited in the record with respect to the facility manager making the decision to open a facility on a day that it was otherwise closed. The driver's facilities are typically closed on Sundays and Mondays and open Tuesdays through Saturdays. In this particular case, in order to help a mental health facility in the area whose residents didn't feel comfortable coming to the facility during regular business hours, the facility manager made the decision to open the facility on Monday in order to process those individuals. She did talk to her supervisors because she had to make sure she had access to the computer systems which are normally shut down on that day for the Secretary of State and that decision that she made would have required the issuance of overtime which she was authorized to do. It did turn out as pointed out in the record that that did not actually come to fruition because the mental health facility decided that it did not want to bring its residents there on a special day, so instead the facility manager made arrangements during other times during the week to make sure that when the residents were brought in that services were provided in a prompt and efficient manner. So they could get state identification cards, I take it. The record wasn't clear on what they were actually doing. I doubt if it was driver's license, I would assume it was state identification cards or other documents. Another area where they exercised such discretion is whether or not to process individuals who come into the facility towards the end of the day, what services they need, whether or not there's sufficient staff to handle that, whether or not to keep staff over. I know that the record also was clear that they have the authority to order overtime and the union has claimed, well, that's not really any discretion at all because overtime is set forth in the collective bargaining agreement. Well, it is true that the collective bargaining agreement says if somebody works overtime, this is what they get paid or if there is overtime available, here's who should be working it. But it's the facility manager who doesn't have to get any prior approval whatsoever, according to the record, that determines whether or not, on the first instance, overtime is necessary and if so, how many people work. It's only after that decision is made, where they're committing the funds of the Secretary of State, that then the collective bargaining agreement would come into place, okay, who is supposed to stay and do that work. It is true that the facility manager would later tell or notify their supervisor, the regional manager, of the overtime, but only to make them aware since they know what to be looking for so that they can track overtime expenses. You're welcome. Another area, actually, where there is, they have the authority to act where there is areas of principle disagreement is in discipline. It's the facility managers who evaluate probationary employees who, for the first six months, the facility manager would determine whether or not this individual is worthy of staying on in the Secretary of State's office or whether or not they should be let go during the probationary period. The facility manager makes the recommendation to the regional manager and the record was clear that the regional manager follows that decision. Further, with respect to other forms of discipline, the facility managers have the authority to issue oral reprimands and they also have the authority to determine or the opportunity to determine whether or not to recommend higher discipline to their supervisors. In doing so, unless the facility manager determines that a particular individual's conduct is such that it warrants discipline, the regional manager or any other people in the chain of command would never even know that this employee is performing subpar. It's only if the facility manager makes them aware of that. And even the union's own witness on this point testified that there was or his testimony proves that there was principle disagreement on the issue of discipline. Specifically referencing a case where one of his employees had forgotten her keys or lost her keys to the facility and he notified the regional manager, he did not believe discipline was appropriate in that case, the regional manager did. Further, he also believed, he said it was his own practice, one that he came up with without any direction of the Secretary of State, that on issues of discipline, it shouldn't be one person deciding, it should be two. So he decided to bring other people in on deciding discipline. I know I'm running out of time. There's a couple of things I want to address with the union's argument. With respect to the other arguments I was going to address today, we stand on the arguments we raised in our brief. But I do want to point out, because the union has consistently tried to rely on the Gibbons case as supporting the fact that these employees do not meet the McKelvey standard. But the Gibbons case, which is an Eighth Circuit case out of Missouri, a state that doesn't have near the level of unionization that Illinois does, is not applicable in this case. It actually underscores the difficulty in relying on the McKelvey First Amendment type cases and then trying to apply them in a labor relations context. That case was deciding whether or not the facility manager, whether or not they could still do their job appropriately if they are a Republican, a Democrat, or independent, or no matter what their political affiliation. The statute in this case, that what you're being asked to decide, is whether or not facility managers in Illinois can appropriately do their job when they're in the same union as the people that they supervise, when they are the individual that's in charge of the facility. And then, I'll leave it there. Thank you very much, unless you have any more questions. I see no questions. Thank you for your argument. Is there any rebuttal? Please, the court. So, you heard both advocates on the other side of the table arguing about inefficiencies, and that there were inefficiencies created when these DFMs are in the same bargaining unit as those who they oversee. But the Secretary of State was given a full opportunity to develop an evidentiary record of that. And there is not one instance in this record where it was established that there was such a conflict or such an inefficiency that was created. DFMs have been unionized since 2003. That is a long period of time to have developed such inefficiencies or conflicts should they exist. But there was no evidence presented of such inefficiencies. You heard about, well, this is the management bill, and so surely anybody who looks like a manager must be excluded because that was the legislative intent. But I go back to those first cases that were talking about the confidentiality exclusion, the exclusion for confidential employees. But under that reasoning, you could say, well, the legislature really wanted to make sure that confidential employees didn't have a union. So anybody who looks like a confidential employee has to be out. But that's not what this Court has done. The Court has said, no, the presumption is that individuals should have bargaining rights, and therefore the exclusion should be read narrowly. Nothing about that has changed in these amendments. Now, I don't know how anybody could make sense of the plain reading meaning of this provision of the Act that I referenced as the Nacone exception. But to the extent that any sense can be gleaned from it, what I see is that individuals have to have meaningful input into government decision-making. What these folks do is they sometimes exercise some discretion in determining what best to do in their facilities. But I think that's a far cry to say that that's government decision-making. That's where I go back to the planning, the policies for the department. They don't plan the policies for the department, which is government decision-making. They implement those policies in their facilities. And room for principle disagreement. I haven't referenced it yet, but there are reams. There were so many policies that we couldn't give them to you all in paper form, so we gave you a disc. There are probably 6,000 pages minimum of policies that the director for the Secretary of State said covered anything that could possibly happen within a facility. He referred to it as their Bible. These are not folks who develop policies. They aren't folks who determine on the fly what should happen within their facilities. To the extent there's a question, they go to those thousands of pages of policies. I don't know that we do much good about squabbling about these particular areas of discretion that Mr. Bennett talked about, but I could spend a couple of minutes. And to his credit, I think he did a very good job explaining the points and counterpoints. But just to reemphasize those. He mentioned the determination of whether someone's provided sufficient identification in order to get an identification. And as he acknowledged, in those thousands of pages of policies, there's a policy that talks about how to determine if that's happened. That is not them developing. And thank God they can't develop and determine on their own whether someone should get an ID. They reference the policies. They don't make that decision themselves. The decision to open on a day that was otherwise closed. On the record, it is said by the director of the Secretary of State that this individual asked permission and it was approved. She wasn't making it up. I believe the testimony on the record is pretty clear about whether to service somebody at the end of the day. The policy is if it's something simple, you do it. You stay over and do it. If it's something more complicated, you give them a rain check and you ask them to come back and they can come to the front of the line when they come back. That's on the record. This is not something that they have discretion over. There are policies about this. And then discipline, as opposing counsel was candid in admitting to you all, if we get into the extensive discipline, we're talking about discharges, suspensions, determinations whether to hire somebody on the other end of things. DFMs don't do that. That happens at a much higher level than what they exercise within their facilities. So even under this plain meaning interpretation, the best that they can identify is not important government decision-making. It is very important functions, but it is not important government decision-making. Thank you. Thank you. The case is submitted and the court stands in recess until after lunch.